# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

———————————————

№ 12-CV-4422 (JFB) (ARL)

———————————————

## MICHAEL ANDERSON,

Plaintiff,

VERSUS

## NATIONAL GRID, PLC, AND ROBERT DEMARINIS,

Defendants.

———————————————

**MEMORANDUM AND ORDER**
March 25, 2015

———————————————

JOSEPH F. BIANCO, District Judge:

Plaintiff Michael Anderson ("Anderson" or "plaintiff") commenced this action against National Grid, PLC ("National Grid") and Robert DeMarinis (collectively, "defendants") on September 5, 2012. He alleges disability discrimination in violation of the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq.* ("ADA"), and the New York State Human Rights Law, N.Y. Exec. Law §§ 290 *et seq.* ("NYSHRL"). In particular, plaintiff claims that National Grid, his former employer, and DeMarinis, a Vice President of National Grid, (1) failed to accommodate plaintiff's spondylolisthesis, a condition that caused back pain; (2) terminated his employment with National Grid because he suffered from spondylolisthesis; and (3) terminated him because he requested a reasonable accommodation for his spondylolisthesis.

Defendants move for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the reasons set forth herein, the Court grants summary judgment for defendants as to the ADA claims and declines to exercise supplemental jurisdiction over the NYSHRL claims.

First, the Court concludes that plaintiff's failure to accommodate and discriminatory discharge claims fail as a matter of law because no reasonable jury could find that plaintiff was disabled within the meaning of the ADA. Under the ADA, a disability is an impairment that substantially limits a major life activity, and in the instant case, there is no evidence that plaintiff's spondylolisthesis substantially limited his ability to perform the major life activities of sitting or working.

Second, even if plaintiff could be found to be "disabled" within the meaning of the ADA, his reasonable accommodation claim still cannot survive summary judgment

1

because he acknowledged under oath that he was performing all the essential functions of the job at the Patchogue Yard without any accommodation.

Third, even assuming *arguendo* that plaintiff was disabled, the Court concludes that plaintiff has failed to raise a triable issue of fact concerning defendants' motivation for terminating his employment. Defendants have proffered evidence that they terminated plaintiff's employment because plaintiff had been spending time at home during his workday several times per week, and because plaintiff failed to cooperate in good faith with their investigation into his conduct. In fact, it is uncontroverted that: (1) plaintiff went home during the workday several times per week; and (2) when asked about his hours, plaintiff lied and stated that he only went home during the workday two or three days per month. Plaintiff explained that he was going home during the work day to rest his back, which was aggravated by extended driving and sitting while working – that is, in the middle of the day, he drove about forty-five minutes from work in Patchogue to his home in Southampton to rest his back, before driving back to work later in the day. Thus, plaintiff drove approximately an additional hour and a half for the purported reason of resting his back from the driving activity at work. Plaintiff also explains that he gave false information in the investigation because he was nervous and frightened. Regardless of what plaintiff's explanation is for his conduct and false statements in the investigation, plaintiff has provided no evidence that this legitimate, non-discriminatory reason for his termination was pretext for discrimination. In particular, the Court rejects plaintiff's argument that discrimination must have motivated defendants' decision to terminate him because other, non-disabled employees of National Grid had engaged in similar conduct without being investigated or

terminated. Critically, there is no evidence that defendants knew about the alleged malfeasance by these employees, and the one other employee whom defendants investigated had not engaged in the same type of conduct that plaintiff was believed to have committed. In short, the uncontroverted facts establish that National Grid had good reason to believe plaintiff had violated company policy, and there is simply no reason for a rational jury to find that the decision to terminate plaintiff (even if they disagreed with it) was motivated by disability discrimination.

Fourth, the Court concludes that defendants are entitled to summary judgment on plaintiff's retaliation claim for many of the reasons just stated. In addition, there is uncontroverted evidence in the record that an anonymous complaint in March 2011 asserting that plaintiff was receiving overtime pay for time he was spending at home triggered the investigation of plaintiff's conduct by National Grid's Ethics and Compliance Office. In sum, plaintiff has produced no evidence showing that defendants' proffered reason for terminating his employment—violations of company policy—were pretext for either discrimination or retaliation.

Finally, because the Court grants summary judgment to defendants on all federal claims, the Court declines to exercise supplemental jurisdiction over the state law discrimination claims.

## I. BACKGROUND

### A. Facts

The following facts are taken from the parties' depositions, declarations, exhibits, and respective Local Rule 56.1 statements of facts. Upon consideration of a motion for summary judgment, the Court construes the

facts in the light most favorable to the nonmoving party. *See, e.g., Capobianco v. City of New York*, 422 F.3d 47, 50 n.1 (2d Cir. 2005). Unless otherwise noted, where a party's Rule 56.1 statement is cited, that fact is undisputed, or the opposing party has not pointed to any evidence in the record to contradict it.[1] The Court reserves recitation of certain facts for its analysis of the specific issues raised by the present motion.

### 1. Plaintiff's Employment at National Grid

National Grid is a public utility that provides natural gas service to customers on Long Island and elsewhere in New York. (Defs.' 56.1 ¶ 1.) The company has several facilities on Long Island, each of which serves a defined region. (*Id.* ¶ 2.) Relevant for purposes of the instant case are the facility in Riverhead (the "Riverhead yard"), which serves the region of Long Island east of the William Floyd Parkway, and the facility in Patchogue (the "Patchogue yard"), which serves a portion of Long Island west of the William Floyd Parkway. (*See id.* ¶¶ 3–4.)

Plaintiff began working for the Long Island Lighting Company ("LILCO"), National Grid's predecessor, in 1978.[2] (Aff. of Jessica C. Moller ("Moller Aff.") Ex. D; Dep. of Michael James Anderson ("Anderson Dep.") at 10.) From approximately 2000 until his termination in 2011, plaintiff was a senior field

supervisor—a management level position responsible for the supervision of laborers, utility mechanics, and foremen—in gas field operations. (Defs.' 56.1 ¶¶ 6, 9; Anderson Dep. at 34.) As discussed *infra,* he worked in the Riverhead yard from 2000 through June 2010, when he was transferred to the Patchogue yard.

The instant case revolves around plaintiff's dissatisfaction with his transfer to the Patchogue yard due to a back condition called spondylolisthesis that made it difficult for him to drive long distances. Plaintiff was first diagnosed with spondylolisthesis in 1999, and he avers that the condition causes him "excruciating back pain" that is "aggravated by long periods of sitting and/or driving." (Aff. of Kathleen A. Tirelli ("Tirelli Aff.") Ex. CC; Aff. of Michael Anderson ("Anderson Aff.") ¶¶ 9–10.) To alleviate the pain, plaintiff had metal rods and screws inserted in his back sometime in 2000. (*Id.* ¶ 11.) After surgery, plaintiff was restricted from driving for more than thirty minutes at a time for four to six weeks. (Defs.' 56.1 ¶ 15; Pl.'s 56.1 ¶ 15; Anderson Dep. at 99–100 & Ex. 4.) When he returned to work, plaintiff was assigned a desk job as a resource planner in the Riverhead yard because driving for more than thirty minutes at a time aggravated his back. (Anderson Aff. ¶ 12; Anderson Dep. at 15.) Then plaintiff's manager asked him if he would assume the job of field supervisor, and plaintiff accepted even though was concerned about the amount of driving he would have to do. (Anderson Aff. ¶¶ 15, 18.) Plaintiff claims that he was assigned to the Riverhead yard for the next ten years because it was close to his home in Southampton, thus minimizing his commute time. (*Id.* ¶¶ 14, 18; *see also* Defs.' 56.1 ¶ 8.)

Over the ensuing years, plaintiff's back condition became known to others in the

---

[1] Although the parties' respective Rule 56.1 statements of facts contain specific citations to the record, the Court cites to the Rule 56.1 statement instead of the underlying citation to the record where possible.

[2] National Grid's predecessor, KeySpan, formed as the result of a merger between LILCO and Brooklyn Union Gas Company in 1998. (Aff. of Kevin McConnell ("McConnell Aff.") ¶ 4.) In 2007, KeySpan merged into National Grid. (*Id.*; *see also* Anderson Dep. at 11.)

company. One of plaintiff's co-workers, Michael Stano, testified that plaintiff's back pain was "common knowledge" because everyone could see that he had trouble sitting down. (Moller Aff. Ex. F & Tirelli Aff. Ex. T, Dep. of Michael Stano ("Stano Dep.") at 19–20.) Stano further stated that he thought everyone, at least the supervisors in Suffolk County, knew about plaintiff's bad back. (*Id.* at 19.) In addition, in 2002, plaintiff's doctor advised plaintiff to restrict his driving on a permanent basis. (Tirelli Aff. Ex. DD, Aff. of Dr. John J. Brennan ("Brennan Aff.") ¶ 6.) The doctor also claims to have advised National Grid that plaintiff's driving should be limited because of his bad back.[3] (*Id.* ¶¶ 7–8.) In 2006, when Michael Howley ("Howley") became plaintiff's manager, plaintiff also informed Howley of his back condition. (Anderson Aff. ¶ 21.) However, even though plaintiff claims he had been assigned to the Riverhead yard to accommodate his bad back, Howley testified that he did not know why plaintiff was stationed in the Riverhead yard for as long as he was. (Moller Aff. Ex. E & Tirelli Aff. Ex. S, Dep. of Michael Howley ("Howley Dep.") at 17.)

In June 2010, Howley decided to transfer plaintiff from the Riverhead yard to the Patchogue yard. (Howley Dep. at 17; Anderson Aff. ¶ 21; Aff. of Robert DeMarinis ("DeMarinis Aff.") ¶ 4.) Howley told plaintiff that he needed plaintiff's leadership in the Patchogue yard. (Anderson Dep. at 128; *see also* Howley Dep. at 17–18.) Plaintiff was happy that Howley had shown such confidence in him, as the Patchogue yard was known to be more

difficult to supervise. (Anderson Dep. at 128–29.) However, the transfer to the Patchogue yard, which was farther away from plaintiff's home than the Riverhead yard, meant a longer commute (specifically, a forty-five minute drive in each direction) for plaintiff. (Anderson Aff. ¶¶ 22–23; Anderson Dep. at 171.) Plaintiff expressed to Howley his concern about the transfer because of the increased driving time. (Anderson Dep. at 171; Anderson Aff. ¶ 24; Howley Dep. at 18.) In addition, plaintiff claims he told Howley that he had been assigned to the Riverhead yard because of his bad back. (Anderson Dep. at 133; Anderson Aff. ¶ 24.) According to plaintiff, Howley assured him that he could move back to the Riverhead yard if necessary. (Anderson Dep. at 133–34; Anderson Aff. ¶¶ 25, 27.) Howley testified that he told plaintiff he would reevaluate his transfer after a certain time. (Howley Dep. at 19.)

Plaintiff began working out of the Patchogue yard in July 2010. (Anderson Aff. ¶ 28.) As a field supervisor in Patchogue, plaintiff supervised twenty-three to twenty-five gas crew employees. (Defs.' 56.1 ¶ 13.) At the time, plaintiff was the only field supervisor assigned to the Patchogue yard (Anderson Dep. at 42; Anderson Aff. ¶ 29), and the workload was much greater than it had been at the Riverhead yard (Anderson Aff. ¶ 29; Howley Dep. at 21). Despite the increased responsibilities, plaintiff told Howley in a 2011 review that he thought he was doing well in Patchogue, meeting all his goals, and achieving a good result. (Anderson Dep. at 125.) Howley agreed that plaintiff's performance was "good." (Howley Dep. at 36.) Outside of work, plaintiff was able to do physical work around the house and play golf. (Anderson Dep. at 179.)

However, about six months into his placement at Patchogue, plaintiff asserts that

---

[3] Following unrelated shoulder surgery, another doctor submitted a note dated February 23, 2009, to National Grid stating that plaintiff could return to work with "no restrictions." (Anderson Dep. at 103–04 & Ex. 5.)

his back pain became "intolerable," and he requested a transfer back to Riverhead. (Anderson Aff. ¶¶ 30–31.) According to plaintiff, he told Howley that his back was "getting to the point where [he could] no longer get to and from work without excruciating pain and that [he] need[ed] to get back to the Riverhead field office." (Anderson Dep. at 144.) Plaintiff asked Howley three times for a transfer before Howley informed him in February 2011 that his request for a transfer had been denied. (Anderson Aff. ¶¶ 31–37.) Howley told him that he needed to be in the Patchogue yard for at least a year. (Howley Dep. at 20.) When plaintiff told Howley that he was suffering, Howley told him to do what he needed to do to take care of his back. (*Id.* ¶¶ 38–39; Anderson Dep. at 148; Howley Dep. at 20.)

### 2. National Grid's Investigation into Plaintiff's Alleged Conduct

Shortly thereafter, in March 2011, DeMarinis received an anonymous written complaint concerning plaintiff. (Defs'. 56.1 ¶ 25;[4] Tirelli Aff. Ex. R, Dep. of Robert DeMarinis ("DeMarinis Dep.") at 21.) The complaint alleged that plaintiff had been receiving overtime pay for time he was spending at home. (Defs.' 56.1 ¶ 26.) DeMarinis referred the complaint to National Grid's Ethics and Compliance Office, and the Ethics and Compliance Office conducted an investigation into the alleged conduct. (*Id.* ¶¶ 44–45; Pl.'s 56.1

¶¶ 44–45.[5]) Kevin McConnell ("McConnell"), Christopher Dorsey ("Dorsey"), and Frank Prost ("Prost") conducted the investigation. (Defs.' 56.1 ¶ 47; Pl.'s 56.1 ¶ 47.) As part of that investigation, McConnell reviewed the call records of the cellular telephone that National Grid had provided to plaintiff, and he compared those records to the hours plaintiff claimed to have worked overtime. (Defs.' 56.1 ¶ 48; Pl.'s 56.1 ¶ 48.) The call records covered the period from November 1, 2010, to March 31, 2011. (Defs.' 56.1 ¶ 49; Pl.'s 56.1 ¶ 49.) McConnell's review demonstrated that on many days when plaintiff claimed to have worked overtime, he had made or received numerous phone calls outside the Patchogue yard's service area throughout the day. (Defs.' 56.1 ¶ 51; *see* McConnell Aff. ¶¶ 18–19.) For instance, plaintiff's cell phone records for November 18, 2010, show eleven separate phone calls made or received east of the Patchogue yard's service area from 8:31 a.m. to 2:02 p.m. (*See* McConnell Aff. Ex. D at 00345–00346.) Plaintiff also claimed to have worked seven hours of overtime for that day. (*See* McConnell Aff. Ex. E at 00409.) Similarly, plaintiff's phone records for February 4, 2011, show sixteen separate phone calls made or received east of the Patchogue yard's service area during the day. (*See* McConnell Aff. Ex. D at 00366.) More specifically, plaintiff made or received

---

[4] Plaintiff disputes this fact only by asserting in his own Rule 56.1 Statement, without any supporting facts, that the complaint could have been fabricated. (*See* Pl.'s 56.1 ¶ 25.) In other words, plaintiff has not produced any evidence contradicting DeMarinis's sworn statement that he received an anonymous complaint concerning plaintiff in March 2011. The Court thus considers that fact to be undisputed.

[5] Plaintiff disputes the fact that DeMarinis referred the complaint to the Ethics and Compliance Office on the basis that he "has no knowledge of the veracity of this statement." (Pl.'s 56.1 ¶ 44.) Here, and in other instances where plaintiff disputes a fact only by denying personal knowledge of it, the Court deems the fact to be undisputed. *See, e.g.*, *Auricchio v. Town of DeWitt*, No. 10-CV-1072 GTS/ATB, 2013 WL 868261, at *2 n.5 (N.D.N.Y. Mar. 7, 2013) (denying personal knowledge of a fact "is insufficient to create a genuine dispute of material fact on a motion for summary judgment"), *aff'd*, 552 F. App'x 95 (2d Cir. 2014).

ten calls in his hometown of Southampton from 8:43 a.m. to 11:57 a.m., made one call from Patchogue at 1:06 p.m., and then made or received three more calls in Southampton from 1:58 to 3:38 p.m. (*Id.*) No subsequent calls were made or received by plaintiff in the Patchogue yard's service area on that day, but Plaintiff recorded four hours of overtime. (*See id.*; McConnell Aff. Ex. E at 00412.)

On May 27, 2011, National Grid received a second anonymous complaint about plaintiff through its telephone hotline. (Defs.' 56.1 ¶ 56.) This complaint alleged that plaintiff had used a company vehicle for personal reasons. (*Id.* ¶ 57; *see also* Anderson Dep. at 108–09.)

McConnell, Dorsey, and Prost met with plaintiff on May 27, 2011, as part of their investigation into the two anonymous complaints. (Defs.' 56.1 ¶ 58; McConnell Aff. ¶ 24.) At the outset, they advised plaintiff of his duty to cooperate with the investigation. (Defs.' 56.1 ¶ 59.) They asked plaintiff whether he went home during a normal workday, and plaintiff responded that he would go home two to three days per month. (*Id.* ¶ 62.) When McConnell challenged him on this response, citing plaintiff's phone records, plaintiff acknowledged that he was actually going home during the workday several times per week. (Anderson Dep. at 73; McConnell Aff. ¶ 26.) At first, plaintiff claimed he did not know precisely why he was spending so much time at home, but after the investigators pressed him, he stated that he was going home to rest his back.[6] (McConnell Aff. ¶ 27.) Plaintiff explained

that he had obtained the permission of his manager, Howley, but conceded that he had not informed Howley each time he left work to go home. (*Id.*) In fact, Howley did not know the extent to which plaintiff was going home during normal work hours. (Defs.' 56.1 ¶ 67.) Plaintiff claims that he was not forthcoming with National Grid's investigators because he wanted to protect Howley. (Anderson Dep. at 72.) He also testified that, when he stated initially that he went home several times per month, he had not realized how frequently he had been going home. (*Id.*)

Despite plaintiff's explanations for his answers, McConnell believed that plaintiff was not forthcoming and, along with Dorsey, concluded that plaintiff had violated company policy by spending significant portions of his workday outside his assigned region, and by failing to cooperate with the investigation. (McConnell Aff. ¶¶ 25, 28.) In particular, according to McConnell, he and Dorsey concluded that plaintiff should be terminated for his violations of National Grid's code of ethical conduct entitled "Doing the Right Thing: Our Standards of Ethical Business Conduct" (the "Standards of Conduct"). (*Id.* ¶ 28; *see* DeMarinis Aff. ¶ 6 & Ex. A, Standards of Conduct.) The Standards of Conduct require all employees to "adhere to the highest levels of honesty, integrity and ethics at all times when conducting business for the Company," and they express a "zero-tolerance policy of any kind of . . . fraudulent or corrupt business practice." (Defs.' 56.1 ¶¶ 29–30; DeMarinis Aff. Ex. A, Standards of Conduct.) The Standards of Conduct expressly prohibit false or misleading entries of time worked by National Grid employees.[7] (*See* Defs.'

---

[6] In his deposition, plaintiff testified that he drove forty-five minutes in each direction to lie down and rest his back for one or two hours. (Anderson Dep. at 208-09.) In his opinion, this was necessary to obtain relief from the pain. (*See id.* at 209–10.)

[7] Relevant in this respect is National Grid's "Premium Pay Policy," which governed overtime pay for managers as of July 1, 2010. (*See* DeMarinis Aff.

56.1 ¶¶ 31–33.) They also require National Grid employees to cooperate with an investigation into fraudulent business practices, and explicitly state that the failure to cooperate in good faith could lead to termination of employment. (*Id.* ¶¶ 35–36.)

McConnell and Dorsey informed DeMarinis about the results of their investigation (Defs.' 56.1 ¶ 71), and DeMarinis avers that he decided to fire plaintiff on this basis (DeMarinis Aff. ¶ 12). National Grid terminated plaintiff's employment on June 6, 2011. (Defs.' 56.1 ¶ 75.)

After plaintiff was fired, he spoke with DeMarinis on the phone and explained his back condition to him. (Anderson Dep. at 84; DeMarinis Dep. at 29.) According to plaintiff, DeMarinis stated that National Grid would have accommodated him had he requested a transfer. (Anderson Dep. at 84.) According to DeMarinis, DeMarinis told Anderson that he had not known about Anderson's back condition, and that National Grid did the best it could for its employees. (DeMarinis Dep. at 29.)

Following his termination, plaintiff worked for a landscaping and snow removal business in 2011 and 2012. (Anderson Dep.

---

Ex. C, Premium Pay Policy.) Plaintiff received a salary for working eight hours per day, five days per week (or forty hours per week), and he was also eligible for overtime compensation under the Premium Pay Policy. (Defs.' 56.1 ¶ 19; Pl.'s 56.1 ¶ 19; DeMarinis Dep. at 15; *see also* Stano Dep. at 13 ("I think if it was anything more than eight hours was overtime.").) There is some dispute in the record as to when an employee could claim overtime (see Anderson Dep. at 40 (arguing that the overtime policies were not so "cut-and-dry")), but the policy itself required a field supervisor like plaintiff to work more than forty hours per week before he became eligible for overtime (see Defs.' 56.1 ¶ 23; Pl.'s 56.1 ¶ 23).

at 17–20.) He still plays golf, cuts his own lawn, and removes his own snow. (*Id.* at 24–25.)

## B. Procedural History

Plaintiff commenced this action on September 5, 2012. Following discovery by the parties, defendants moved for summary judgment on March 28, 2014. Plaintiff filed his opposition to the motion on May 12, 2014, and defendants filed their reply on May 30, 2014. The Court heard oral argument on the motion on June 9, 2014. The Court has fully considered the submissions of the parties.

## II. STANDARD OF REVIEW

The standard for summary judgment is well settled. Pursuant to Federal Rule of Civil Procedure 56(a), a court may grant a motion for summary judgment only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Gonzalez v. City of Schenectady*, 728 F.3d 149, 154 (2d Cir. 2013). The moving party bears the burden of showing that he is entitled to summary judgment. *See Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The court "'is not to weigh the

evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments.'" *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004) (quoting *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996)); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party "'must do more than simply show that there is some metaphysical doubt as to the material facts . . . . [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*.'" *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (alteration and emphasis in original) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)). As the Supreme Court stated in *Anderson*, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." 477 U.S. at 249–50 (citations omitted). Indeed, "the mere existence of *some* alleged factual dispute between the parties alone will not defeat an otherwise properly supported motion for summary judgment." *Id.* at 247–48 (emphasis in original). Thus, the nonmoving party may not rest upon mere conclusory allegations or denials but must set forth "'concrete particulars'" showing that a trial is needed. *R.G. Grp., Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984) (quoting *SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir. 1978)). Accordingly, it is insufficient for a party opposing summary judgment "'merely to assert a conclusion without supplying supporting arguments or facts.'" *BellSouth Telecomms., Inc. v. W.R.*

*Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996) (quoting *Research Automation Corp.*, 585 F.2d at 33).

III. DISCUSSION

A. ADA Claims

The ADA provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). In the instant case, plaintiff brings three claims under the ADA: (1) failure to accommodate; (2) discriminatory discharge; and (3) retaliation. For the reasons set forth *infra*, the Court grants summary judgment for defendants as to all ADA claims.

1. Failure to Accommodate

Plaintiff claims that defendants failed to accommodate his spondylolisthesis by denying his request for a transfer from the Patchogue yard to the Riverhead yard. Defendants argue that plaintiff's claim cannot survive summary judgment because there is no evidence that plaintiff was disabled within the meaning of the ADA, and because plaintiff was able to perform his job at the Patchogue yard without any accommodation. For the reasons set forth *infra*, there is no triable issue of fact concerning plaintiff's physical limitations from his spondylolisthesis, and the Court holds that plaintiff was not disabled as a matter of law. The Court thus grants summary judgment to defendants on the failure to accommodate claim.

a. Legal Standards

"Discrimination in violation of the ADA includes, *inter alia*, 'not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability.'" *McBride v. BIC Consumer Prods. Mfg. Co., Inc.*, 583 F.3d 92, 96 (2d Cir. 2009) (quoting 42 U.S.C. § 12112(b)(5)(A)). Moreover, a "qualified individual" under the ADA is "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8); *see McBride*, 583 F.3d at 96. Accordingly, a plaintiff can establish a *prima facie* claim of disability discrimination based on the failure to accommodate a disability by proving the following elements:

> (1) plaintiff is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations.

*McMillan v. City of New York*, 711 F.3d 120, 125–26 (2d Cir. 2013) (citing *McBride*, 583 F.3d at 97). Once a plaintiff has established a *prima facie* case, the burden shifts to the defendant to show "(1) that making a reasonable accommodation would cause it hardship, and (2) that the hardship would be undue." *Mitchell v. Washingtonville Cent. Sch. Dist.*, 190 F.3d 1, 6 (2d Cir. 1999) (citing *Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 138 (2d Cir. 1995)); *see also Scalera v. Electrograph Sys., Inc.*, 848 F. Supp. 2d 352, 360 (E.D.N.Y. 2012) ("[O]nce Plaintiff puts forth a prima facie case, the burden shifts to the employer to demonstrate that the employee's proposed accommodation would result in an undue hardship.").

The instant case hinges on the first element, *i.e.*, whether plaintiff was disabled. The ADA Amendment Act of 2008 ("ADAAA"), effective January 1, 2009, altered the analysis of this element. In particular, "[t]he ADAAA substantially broadened the definition of a disability under the law, in explicit response to *Sutton v. United Air Lines*, 527 U.S. 471 (1999) and *Toyota Motor Mfg. v. Williams*, 534 U.S. 184 (2002), in which the ADA's terms defining disability had been strictly defined." *Green v. DGG Props. Co., Inc.*, No. 11-CV-1989 (VLB), 2013 WL 395484, at *9 (D. Conn. Jan. 31, 2013) (quotation marks and citation omitted); *see also Kravtsov v. Town of Greenburgh*, No. 10-CV-3142 (CS), 2012 WL 2719663, at *10 (S.D.N.Y. July 9, 2012) ("In enacting the ADA, Congress intended to provide broad coverage for individuals with disabilities, and in enacting the ADAAA in 2008, rejected Supreme Court precedent in *Toyota Motor Mfg. v. Williams*, 534 U.S. 184 (2002), as interpreting the term 'substantially limits' to require a greater degree of limitation than was intended." (internal quotation marks and citation omitted)). "While the terms of the statute were not changed, the interpretation of those terms was modified." *Brtalik v. S. Huntington Union Free Sch. Dist.*, No. 10-CV-0010, 2010 WL 3958430, at *7 (E.D.N.Y. Oct. 6, 2010). Specifically, the ADAAA directs courts to construe the term disability "in favor of broad coverage of individuals under [the ADA], to the maximum extent permitted by the terms of [ADA]." 42 U.S.C. § 12102(4)(A).

The ADA defines a "disability" as:

> (A) a physical or mental impairment that substantially limits one or more

major life activities of such individual;

(B) a record of such an impairment; or

(C) being regarded as having such an impairment.

42 U.S.C. § 12102(1). For a plaintiff to establish that he has a disability under the statute's first subsection (*i.e.*, to show that he is actually disabled), he must "(1) 'show that [he] suffers from a physical or mental impairment,' (2) 'identify the activity claimed to be impaired and establish that it constitutes a 'major life activity,'' and (3) 'show that [his] impairment 'substantially limits' the major life activity previously identified.'" *Kravtsov*, 2012 WL 2719663, at *10 (quoting *Weixel v. Bd. of Educ.*, 287 F.3d 138, 147 (2d Cir. 2002)).[8]

b. Application

Plaintiff's claimed impairment is spondylolisthesis, and plaintiff identifies sitting, driving, and working as the major

life activities that the spondylolisthesis substantially limited. (*See* Pl.'s Opp. at 10–11.) To support the existence of this asserted disability, plaintiff cites the affidavit of his doctor, John J. Brennan, wherein Dr. Brennan avers that he has treated plaintiff's spondylolisthesis since 2000 and has advised plaintiff "to permanently restrict his driving to minimal periods of time." (Brennan Aff. ¶¶ 5–6.) Plaintiff relies only on his own affidavit to support the fact that he cannot sit for long periods of time. (*See* Pl.'s Opp. at 10 (citing Anderson Aff. ¶¶ 10–12).) The only other evidence in the record concerning plaintiff's inability to sit comes from the deposition testimony of Stano, who stated that he had been able to observe plaintiff experiencing difficulty sitting. (Stano Dep. at 19–20.)

To determine whether there are material facts in dispute on the issue of whether plaintiff is disabled, the Court considers the evidence in the summary judgment record as it relates to the three elements of an actual disability under 42 U.S.C. § 12102(1)(A): (1) a physical or mental impairment; (2) a major life activity; and (3) substantial limitation of the major life activity by the impairment.

i. Impairment

The EEOC regulations, to which the Second Circuit accords "great deference," *Francis v. City of Meriden*, 129 F.3d 281, 283 n.1 (2d Cir. 1997), define a "[p]hysical or mental impairment" to mean

(1) [a]ny physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more body systems, such as neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive,

---

[8] The plaintiff in this case does not rely upon the second or third definitions of "disability" to support either his failure to accommodate claim or his discriminatory discharge claim. In addition, the Court notes that an individual "regarded as" disabled, but not actually disabled, cannot bring a failure to accommodate claim as a matter of law. *See* 42 U.S.C. § 12201(h) ("A covered entity under subchapter I, a public entity under subchapter II, and any person who owns, leases (or leases to), or operates a place of public accommodation under subchapter III, need not provide a reasonable accommodation or a reasonable modification to policies, practices, or procedures to an individual who meets the definition of disability in section 12102(1) of this title solely under subparagraph (C) of such section."); *see, e.g.*, *Powers v. USF Holland, Inc.*, 667 F.3d 815, 823 n.7 (7th Cir. 2011) ("[T]he ADAAA clarified that an individual 'regarded as' disabled (as opposed to actually disabled) is not entitled to a 'reasonable accommodation.'" (quoting 42 U.S.C. § 12201(h))).

digestive, genitourinary, immune, circulatory, hemic, lymphatic, skin, and endocrine; or (2) [a]ny mental or psychological disorder, such as an intellectual disability (formerly termed "mental retardation"), organic brain syndrome, emotional or mental illness, and specific learning disabilities.

29 C.F.R. § 1630.2(h). Here, plaintiff has submitted admissible evidence that spondylolisthesis constitutes a physical impairment, and defendants do not contend otherwise.

### ii. Major Life Activities

After the enactment of the ADAAA, major life activities include, but are not limited to, "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2). Major life activities also include "the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions." *Id.* Notably, under the ADAAA, "major life activities no longer need to be of 'central importance.'" *D'Entremont v. Atlas Health Care Linen Servs., Co., LLC*, No. 12-CV-0060 (LEK/RFT), 2013 WL 998040, at *6 (N.D.N.Y. Mar. 13, 2013) (quoting *Sam-Sekur v.. Whitmore Grp., Ltd.*, No. 11-CV-4938, 2012 WL 2244325, at *6 (E.D.N.Y. June 15, 2012)).

Under this standard, it is clear that sitting and working are major life activities. *See, e.g.*, 42 U.S.C. § 12102(2)(A) ("[M]ajor life activities include . . . working."); *Parada v. Banco Indus. De Venezuela, C.A.*, 753 F.3d 62, 68-70 (2d Cir. 2014) (sitting); *Wegner v. Upstate Farms Co-op.*, 560 F. App'x 22, 23-24 (2d Cir. 2014) (working); *Colwell v. Suffolk Cnty. Police Dep't*, 158 F.3d 635, 642 (2d Cir. 1998) (sitting); *Ryan v. Grae & Rybicki*, 135 F.3d 867, 870 (2d Cir. 1998) (sitting).

However, the issue of driving requires some analysis. Prior the passage of the ADAAA, it was well settled that driving does not qualify as a major life activity. *See Colwell*, 158 F.3d at 643; *see also Quintero v. Rite Aid of N.Y., Inc.*, No. 09-CV-6084 (JLC), 2011 WL 5529818, at *11 (S.D.N.Y. Nov. 10, 2011); *White v. Sears, Roebuck & Co.*, No. 07-CV-4286 (NGG) (MDG), 2009 WL 1140434, at *7 (E.D.N.Y. Apr. 27, 2009); *Fleming v. Verizon N.Y., Inc.*, No. 03-CV-5639 (WHP), 2006 WL 2709766, at *16 (S.D.N.Y. Sept. 22, 2006); *Sacay v. Research Found. of City Univ. of N.Y.*, 193 F. Supp. 2d 611, 627 (E.D.N.Y. 2002); *Usala v. Consol. Edison Co. of N.Y.*, 141 F. Supp. 2d 373, 382 (S.D.N.Y. 2001). Relatedly, in this Circuit, courts have repeatedly concluded "[c]ommuting to work . . . is not recognized as a major life activity." *Darcy v. Lippman*, No. 03-CV-6898 (KMW) (DCF), 2008 WL 629999, at *15 (S.D.N.Y. Mar. 10, 2008); *see also Stamm v. N.Y.C. Transit Auth.*, No. 04-CV-2163 (SLT) (JMA), 2011 WL 1315935, at *17 (E.D.N.Y. Mar. 30, 2011) ("[T]his Court concludes that neither travel nor commuting are, themselves, major life activities."). In *Winsley v. Cook County*, the Seventh Circuit described the rationale for excluding driving from the list of major life activities by contrasting driving with the major life activities set forth in 42 U.S.C. § 12102(2) and 29 C.F.R. § 1630.2(i). *See* 563 F.3d 598, 603–04 (7th Cir. 2009). In particular, the Seventh Circuit made the following observations:

[T]he listed activities are so important to everyday life that almost anyone would consider himself limited in a material way if he could not perform them. This is not the case with driving. In fact, many Americans choose not to drive and do not consider the quality of their lives to have been diminished by their choice. Moreover, the importance of the listed activities does not vary depending on where a person lives. The value that people assign to being able to drive, on the other hand, most certainly does. A great number of Manhattanites drive only rarely, while residents of more sparsely populated areas of our country rely heavily on their own automobiles for transportation. Finally, unlike the listed activities, no one has a right to drive; driving on public highways is a privilege subject to revocation for a number of reasons. As the Eleventh Circuit has noted, "[i]t would at the least be an oddity that a major life activity should require a license from the state, revocable for a variety of reasons including failure to insure." *Chenoweth* [*v. Hillsborough Cnty.*], 250 F.3d [1328,] 1329 [(11th Cir. 2001)].

*Id.*

The question is whether driving continues to be excluded from the definition of a "major life activity" in the wake of the ADAAA, in which Congress clearly intended to broaden the definition and coverage of the term "disability." *See, e.g.,* 42 U.S.C. § 12102(4)(A) ("The definition of disability in this chapter shall be construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter.").

Some courts have continued to hold that driving is not a "major life activity" even under the ADA as amended in 2008. *See, e.g., Dorgan v. Suffolk Cnty. Cmty. Coll.*, No. 12-CV-0330 (SJF) (ARL), 2014 WL 3858395, at *6 n.12 (E.D.N.Y. Aug. 4, 2014) (analyzing claims under the ADA, as amended, and noting that "[p]laintiff provides no support for her contention that driving is a major life activity as contemplated by the ADA."); *Nelson v. North Broward Med. Ctr.*, No. 12-61867-CIV, 2013 WL 6842034, at *9 (S.D. Fla. Dec. 27, 2013) (concluding, in a post-ADAAA case, that driving is not a "major life activity" under the ADA); *Clay v. Campbell Cnty. Sheriff's Office*, No. 12-CV-62, 2013 WL 3245153, at *3 n.4 (W.D. Va. June 26, 2013) (holding that driving is not a "major life activity" in a post-ADAAA case); *see generally Neely v. PSEG Texas, Ltd. Partnership*, 735 F.3d 242, 245 (5th Cir. 2013) ("Although the text of the ADAAA expresses Congress's intention to broaden the definition and coverage of the term 'disability,' it in no way eliminated the term from the ADA or the need to prove a disability on a claim of disability discrimination. . . . In other words, though the ADAAA makes it *easier* to prove a disability, it does not *absolve* a party from proving one.") (emphasis in original).

However, this Court need not resolve this issue because, in his opposition brief, plaintiff only argues that he is disabled from the major life activities of sitting and working. (*See* Pl.'s Opp. Brief at 11 ("Plaintiff has established that the major life activity of sitting while driving and working, was substantially limited as compared to most people in the general population.").) In fact, at oral argument, the Court confirmed that plaintiff was not claiming that driving is a major life activity. *See* Oral Arg. Recording (FTR 5:09:36) (Pl.'s Counsel: "Driving, you're right, is not in

itself a major life activity. . . . However, the inability to drive nevertheless could create a disability if it impaired the major life activity of working.").

Thus, the Court analyzes whether there is evidence to create a genuine issue of disputed fact as to whether plaintiff was substantially limited in the major life activities of sitting or working. As discussed below, the Court concludes that there is insufficient evidence from which a rational jury could conclude that he was substantially limited in his ability to sit or work. Moreover, even assuming plaintiff could be found to be "disabled" within the meaning of the law, his claim fails because he admitted in his deposition that he could perform the job without any accommodation.

### iii. Substantial Limitation

Defendant argues that there is insufficient evidence from which a rational jury could find that plaintiff's spondylolisthesis substantially limited his abilities to sit or work. For the reasons set forth below, the Court agrees.

Although the ADA does not define a substantial limitation, *see, e.g.*, *Kravtsov*, 2012 WL 2719663, at *10, the EEOC regulations promulgated after the enactment of the ADAAA make clear that the standard "is not meant to be . . . demanding," 29 C.F.R. § 1630.2(j)(1)(i), and "should not demand extensive analysis," *id.* § 1630.2(j)(1)(iii). Thus, an impairment will be considered a disability under the ADA "'if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population.'" *Risco v. McHugh*, 868 F. Supp. 2d 75, 108 n.47 (S.D.N.Y. 2012) (quoting 29 C.F.R. § 1630.2(j)(1)(ii)). An impairment "'need not prevent, or

significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting.'" *Kravtsov*, 2012 WL 2719663, at *10 (quoting 29 C.F.R. § 1630.2(j)(1)(ii)); *see also Brandon v. O'Mara*, No. 10-CV-5174 (RJH), 2011 WL 4478492, at *7 (S.D.N.Y. Sept. 28, 2011) ("[T]he revised EEOC regulations provide that '[a]n impairment is a disability . . . if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population.' That is, while '[a]n impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting,' the substantially limits analysis is comparative." (quoting 29 C.F.R. § 1630.2(j)(1)(ii))).

### (1) Sitting

Plaintiff has failed to produce any competent evidence that spondylolisthesis substantially limited his ability to sit. As noted *supra*, plaintiff's own affidavit and Stano's deposition testimony provide the only factual basis for plaintiff's asserted inability to sit; plaintiff has not submitted any medical documentation corroborating this assertion. Plaintiff's failure to submit medical records concerning his inability to sit is insufficient as a matter of law.

In his opposition to the summary judgment motion, plaintiff relies on the attached affidavit from Dr. Brennan, in which Dr. Brennan stated the following: (1) "Since driving for periods of time generally over 30 minutes causes exacerbation of his condition, I advised Mr. Anderson to permanently restrict his driving to minimal periods of time."; (2) "On or about 2002, I provided a prescription to Mr. Anderson indicating that his driving is to be minimized due to his condition. This restriction did not

have an expiration date due to the permanence of Mr. Anderson's impairment." (3) "It was my understanding that this prescription was to be provided to Mr. Anderson's employer notifying them of the accommodations that Mr. Anderson needed due to his permanent impairment."; and (4) "I was not able to retrieve a copy of the prescription that I provided to Mr. Anderson in 2002 which indicated his permanent restriction for driving because of a change in the computerized filing system in the office in the past 11 years." (Brennan Aff. ¶¶ 6–9.)[9] This affidavit does not specifically address any sitting limitations that plaintiff may have, but rather focuses on driving. In short, the affidavit does not explain how the back condition impacts his ability to sit (as opposed to drive), nor does it state how any driving restriction impacted his ability to perform his job as a Senior Field Supervisor with the Company.[10] Thus,

---

[9] Plaintiff also has failed to produce a copy of this prescription.

[10] Plaintiff has submitted other medical records establishing that he has spondylolisthesis. (*See* Tirelli Aff. Exs. B, D–E.) As a threshold matter, these documents are not admissible, however, because they are not self-authenticating, and the affirmation of plaintiff's attorney is insufficient to establish their admissibility as hearsay under Federal Rule of Evidence 803. *See, e.g., Singh v. Bay Crane Servs., Inc.*, No. 11-CV-720 (RJD) (RER), 2013 WL 5655931, at *2 n.4 (E.D.N.Y. Oct. 11, 2013) ("While the Bell Retirement Documents certainly appear to be admissible business records, they are not self-authenticating, and the declaration of Singh's attorney does not provide the Court with all the information necessary to establish their admissibility under Federal Rule of Evidence 803."); *see also Presbyterian Church Of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 264 (2d Cir. 2009) (holding that district court deciding whether to grant summary judgment consider only evidence that would be admissible at trial). Nonetheless, even if the Court could consider these records, they establish only that plaintiff suffered an impairment, not that his ability to sit was substantially limited by that impairment. *Cf. Peterec-Tolino v. Commercial Elec. Contractors,*

there is no medical evidence regarding specific limitations on sitting.

"Courts in the Second Circuit have consistently held that when a plaintiff fails 'to offer any medical substantiating the specific limitations to which he claims he is subject due to his condition,' he cannot establish that he is disabled within the meaning of the ADA." *Baerga v. Hosp. for Special Surgery*, No. 97-CV-0230 (DAB), 2003 WL 22251294, at *6 (S.D.N.Y. Sept. 30, 2003) (quoting *Johnson v. St. Clare's Hosp. & Health Ctr.*, No. 96-CV-1425 (MBM), 1998 WL 236235, at *8 (S.D.N.Y. May 13, 1998)) (citing cases); *see, e.g., Peterec-Tolino v. Commercial Elec. Contractors, Inc.*, No. 08-CV-0891 (RMB), 2011 WL 5105474, at *6 (S.D.N.Y. Oct. 26, 2011) ("Plaintiff's failure to provide medical documentation of his asthma also undermines a claim of substantial limitation."); *Davis v. N.Y. State Office of Mental Health*, No. 05-CV-5599 (ARR) (LB), 2009 WL 5178440, at *9 (E.D.N.Y. Dec. 31, 2009) ("Plaintiff's failure to provide medical documentation of his alleged sleeping difficulties and difficulties working renders his 'substantial limitation' showing insufficient as a matter of law."); *Dietrich v. E.I. Du Pont de Nemours & Co.*, No. 02-CV-678S, 2004 WL 2202656, at *8 (W.D.N.Y. Sept. 28, 2004) ("Plaintiff's reliance on his own testimony in support of his claim is similarly deficient because a plaintiff's own testimony, without supporting medical evidence, is an

---

*Inc.*, No. 08-CV-0891 (RMB), 2011 WL 5105474, at *6 (S.D.N.Y. Oct. 26, 2011) (noting that plaintiff's medical evidence did not "provide any information and/or make explicit mention of Plaintiff's ability to lift, work, or carry items, or to perform other major life activities," and holding that "[m]erely submitting evidence of a medical diagnosis of an impairment is insufficient to prove a disability") (internal quotation marks and citations omitted).

insufficient basis to avoid summary judgment.") (citations omitted); *Douglas v. Victor Capital Grp.*, 21 F. Supp. 2d 379, 392 (S.D.N.Y. 1998) ("[Plaintiff's] testimony as to the (alleged) limits on his ability to walk, without supporting medical testimony, simply is not sufficient to establish his prima facie case under the ADA.") (citations omitted). The Second Circuit has not taken a clear position on this issue, but the First and Third Circuits have both held that medical evidence is not absolutely necessary to support a claim of disability under the ADA. *See Katz v. City Metal Co., Inc.*, 87 F.3d 26, 32 (1st Cir. 1996); *Marinelli v. City of Erie, Pa.*, 216 F.3d 354, 360–61 (3d Cir. 2000).

However, even assuming *arguendo* that plaintiff could establish the substantial limitation of a major life activity without medical records, he has not done so here. The only evidence in the summary judgment record concerning plaintiff's inability to sit is plaintiff's own affidavit, in which he avers that sitting for "long periods" aggravated his back pain (Anderson Aff. ¶ 10), and the deposition testimony of Stano, who stated that he observed plaintiff experiencing difficulty sitting (Stano Dep. at 19–20). Such "vague and ambiguous" evidence concerning plaintiff's inability to sit are insufficient to withstand a motion for summary judgment. *McDonald v. City of New York*, 786 F. Supp. 2d 588, 608–09 (E.D.N.Y. 2011) (holding that evidence of plaintiff's inability to sit "for prolonged periods of time" was insufficient as a matter of law to establish a substantial limitation); *see, e.g.*, *Colwell*, 158 F.3d at 644 (holding that evidence of plaintiff's inability to sit "too long" or for "prolonged" periods of time was too vague to show substantial limitation); *Piascyk v. City of New Haven*, 64 F. Supp. 2d 19, 29 (D. Conn. 1999) (holding that evidence of plaintiff's inability to sit for "long periods of time" was "too vague to establish a substantial limitation"), *aff'd*, 216 F.3d 1072 (2d Cir. 2000).

## (2) Working

Plaintiff also contends that his inability to drive for long periods of time due to spondylolisthesis substantially limited his ability to work. *Cf. Winsley*, 563 F.3d at 604 ("Although we hold that driving is not itself a major life activity, the inability to drive nevertheless could create a disability if it caused an impairment of a major life activity."). For an impairment to substantially limit the major life activity of working, such that it qualifies as a disability under the ADA, it must render the individual "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." *O'Connor v. Huntington U.F.S.D.*, No. 11-CV-1275 (JFB) (ARL), 2014 WL 1233038, at *11 (E.D.N.Y. Mar. 25, 2014) (internal citations and quotation marks omitted); *see, e.g.*, *Petrone v. Hampton Bays Union Free Sch. Dist.*, No. 03-CV-4359 (SLT) (ARL), 2013 WL 3491057, at *21 (E.D.N.Y. July 10, 2013), *aff'd*, 568 F. App'x 5 (2d Cir. 2014). "A class of jobs encompasses a breadth of positions related to the one a plaintiff cannot perform, not simply analogous positions with slight variations." *Wegner*, 560 F. App'x at 24 (citing *Muller v. Costello*, 187 F.3d 298, 313 (2d Cir. 1999)). "The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." *Cameron v. Community Aid for Retarded Children, Inc.*, 335 F.3d 60, 65 (2d Cir. 2003) (internal citations and quotation marks omitted).[11]

---

[11] The EEOC regulations used to provide explicitly that a substantial impairment in the major life activity

As a threshold matter, there is insufficient evidence from which a rational jury could find that his back condition impacted his ability to perform his work. In fact, as noted *infra*, plaintiff acknowledged that he met all his job performance goals at the Patchogue yard. *See Bonilla v. Monroe BOCES #1*, No. 06-CV-6542, 2010 WL 3488712, at *6 (W.D.N.Y. Sept. 2, 2010) ("The evidence shows that Plaintiff's depression and bi-polar disorder made performing her job functions difficult, but not impossible. Indeed, the evidence demonstrates that despite her condition, Plaintiff performed her job in an above-average manner. As a result, Plaintiff has not shown how her condition substantially limited her major life activities, and without such evidence, Plaintiff cannot establish a *prima facie* case that she is 'disabled' as defined in the ADA.") (citation omitted).

In any event, plaintiff has failed to submit any evidence that spondylolisthesis rendered him incapable of performing either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills, and abilities. There is simply no "specific evidence about the kinds of jobs from which [plaintiff] is disqualified" in the summary judgment record. *Colwell*, 158 F.3d at 645. Even assuming *arguendo* that plaintiff's spondylolisthesis substantially impaired his ability to perform the job of senior field supervisor at the Patchogue yard, in contrast to his ability to perform the same job at the Riverhead yard, given the longer commute to Patchogue, "[t]he inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working."[12] *Cameron*, 335 F.3d at 65. Accordingly, a reasonable jury could not find that plaintiff's spondylolisthesis substantially limited his ability to work.

*       *       *

---

of working meant that the individual was "'significantly restricted in the ability to perform either a class of jobs or a broad range of jobs,'" and that "'[t]he inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.'" *Cameron*, 335 F.3d at 65 (quoting 29 C.F.R. § 1630.2(j)(3)(i)). However, the EEOC "has removed from the text of the regulations a discussion of the major life activity of working" because "no other major life activity receives special attention in the regulation," and "in light of the expanded definition of disability established by the [ADAAA], this major life activity will be used in only very targeted situations." *Interpretive Guidance on Title I of the Americans with Disabilities Act*, 29 C.F.R. Pt. 1630, App. § 1630.2(j) ("*EEOC Interpretive Guidance*"). Nonetheless, the *EEOC Interpretive Guidance*, which the Second Circuit has treated as authoritative, *see, e.g.*, *Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 99 (2d Cir. 1999), states that "[i]n the rare cases where an individual has a need to demonstrate that an impairment substantially limits him or her in working, the individual can do so by showing that the impairment substantially limits his or her ability to perform a class of jobs or broad range of jobs in various classes as compared to most people having comparable training, skills, and abilities." *EEOC Interpretive Guidance*. Moreover, "[d]emonstrating a substantial limitation in performing the unique aspects of a single specific job is not sufficient to establish that a person is substantially limited in the major life activity of working." *Id.* Accordingly, the test for determining whether a person's ability to work was substantially impaired has not changed.

---

[12] The Court also notes that, if driving continues to be excluded from the major life activity even after the ADAAA, to allow plaintiff to survive summary judgment by resting only on evidence that that he could not drive for long periods of time would impermissibly allow him to establish the substantial impairment of a major life activity—working—simply by showing the substantial impairment of a non-major life activity—driving. *Cf. Kellogg v. Energy Safety Servs. Inc.*, 544 F.3d 1121, 1126 (10th Cir. 2008) ("[A] plaintiff should not be permitted to bypass having to prove substantial limitations in these major life activities [of working or caring for oneself] by providing only evidence that she cannot drive.").

In sum, plaintiff has failed to raise a genuine issue of material fact as to whether his spondylolisthesis substantially limited his ability to sit or work. Accordingly, plaintiff cannot establish that he was actually disabled under the ADA, and defendants are therefore entitled to summary judgment on plaintiff's failure to accommodate claim.

### iv. Reasonable Accommodation

In the alternative, the Court concludes that, even if plaintiff could be found to be "disabled" within the meaning of the ADA, his reasonable accommodation claim still cannot survive summary judgment because he acknowledged under oath that he was performing all the essential functions of the job at the Patchogue Yard without any accommodation.

In order to prove a failure to accommodate claim, plaintiff must show, *inter alia*, "that with reasonable accommodations she could perform the essential functions of the position sought." *Feeley v. N.Y.C. Police Dep't*, No. 97-CV-02891-RJD, 2001 WL 34835239, at *9 (E.D.N.Y. Sept. 4, 2001) (citations omitted). Here, in his deposition, plaintiff admitted that he met all of his job performance goals during the time he was assigned to the Patchogue Yard:

Q.  Isn't it true that in the input that you provided to Mr. Howley, you indicated that you were performing well in Patchogue?

A.  Yes, sir.

Q.  And that you had – you were able to meet all of your goals in Patchogue?

A.  Yes, sir.

Q.  And that you had achieved good results in Patchogue?

A.  Yes, sir.

Q. And you provided that input in March of 2011?

A.  I'm not positive of the date, but I would say that's probably around the date.

(Anderson Dep. at 125–26.)[13]  In short, there is insufficient evidence from which a rational factfinder could conclude that plaintiff needed a reasonable accommodation to perform the essential functions of his job at the Patchogue Yard. Accordingly, summary judgment is warranted, on this alternative ground, with respect to the failure to accommodate claim.[14]

### 2. Discriminatory Discharge

Next, plaintiff claims that defendants terminated his employment because of his disability. In the absence of direct evidence of discrimination, a discriminatory discharge claim brought under the ADA is subject to the burden-shifting framework established

---

[13] Plaintiff argues in his brief that his satisfactory performance of his job functions was due to his driving home to rest his back during the work day. (*See* Pl.'s Opp. Brief at 16.)  This argument is nonsensical, however, because it fails to account for the numerous days during which plaintiff did not return home to rest, but was nonetheless able to adequately perform his duties.

[14]  In addition, plaintiff appears to acknowledge that driving was integral to his job responsibilities.  *See* Pl.'s Br. at 10 ("Plaintiff's job responsibilities are centered around extensive driving, amounting to approximately 250 miles per day in the car, sometimes more.") (citing plaintiff's affidavit); *see id.* at 13 ("Plaintiff's inability to sit and drive for long periods of time (activities which are integral to his job responsibilities)….").  Thus, the reasonable accommodation claim also must fail because it is well settled that "a reasonable accommodation can never involve the elimination of an essential function of a job." *Shannon v. N.Y. City Transit Auth.*, 332 F.3d 95, 100 (2d Cir. 2003).

by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See, e.g.*, *McMillan*, 711 F.3d at 125; *McBride*, 583 F.3d at 96. Under this framework, a plaintiff must first set forth a *prima facie* case of discrimination in violation of the ADA by showing the following elements: "'(1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered adverse employment action because of his disability.'" *McMillan*, 711 F.3d at 125 (quoting *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006)). If the plaintiff establishes a *prima facie* case of unlawful discrimination, a rebuttable presumption of discrimination arises, and the burden shifts to the defendant to set forth "some legitimate, nondiscriminatory reason" for the adverse employment action. *McDonnell Douglas*, 411 U.S. at 802. Where the defendant articulates such a reason, then the presumption of discrimination is rebutted, and it "simply drops out of the picture." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510–11 (1993) (citation omitted). The burden then shifts back to the plaintiff to show, without the benefit of any presumptions, that a reasonable jury could conclude by a preponderance of the evidence that his "disability was at least 'a motivating factor' for the adverse employment action." *Hong Yin v. N. Shore LIJ Health Sys.*, 20 F. Supp. 3d 359, 371–72 (E.D.N.Y. 2014); *see Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 336–37 (2d Cir. 2000).[15] To meet

this burden, the plaintiff may rely on evidence presented to establish his *prima facie* case as well as additional evidence. Such additional evidence may include direct or circumstantial evidence of discrimination. *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 99–101 (2003). It is insufficient, however, for a plaintiff merely to show that he satisfies "*McDonnell Douglas*'s minimal requirements of a *prima facie* case" and to put forward "evidence from which a factfinder could find that the employer's explanation . . . was false." *James v. N.Y. Racing Ass'n*, 233 F.3d 149, 157 (2d Cir. 2000). Instead, the key is whether there is sufficient evidence in the record from which a reasonable trier of fact could find in favor of plaintiff on the ultimate issue, *i.e.*, whether the record contains sufficient evidence to support an inference of discrimination. *See id.*; *Connell v. Consol. Edison Co. of N.Y., Inc.*, 109 F. Supp. 2d 202, 207–08 (S.D.N.Y. 2000).

a. *Prima Facie* Case

For the reasons set forth *supra* in connection with plaintiff's failure to accommodate claim, the undisputed facts in the summary judgment record show that

---

[15] Following the Supreme Court's decisions in *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517 (2013), and *Gross v. FBL Fin. Servs., Inc.*, 129 S. Ct. 2343 (2009), it is an open question in this Circuit whether an ADA plaintiff must now show that disability discrimination (or the plaintiff's protected activity, in a retaliation claim) was a but-for cause of the adverse employment action. *See Castro v. City of New York*, 24 F. Supp. 3d 250, 269 n.34 (E.D.N.Y. 2014) ("[T]he question of whether the heightened, 'but-for' standard of causation for Title VII retaliation claims . . . applies to claims asserted under the ADA, is one that has not yet been addressed by the Second Circuit."); *see also Tse v. New York Univ.*, No. 10-CV-7207 (DAB), 2013 WL 5288848, at *18 n.18 (S.D.N.Y. Sept. 19, 2013); *Najjar v. Mirecki*, No. 11-CV-5138 (KBF), 2013 WL 3306777, at *7 (S.D.N.Y. July 2, 2013). This Court need not resolve that issue in this case because, as discussed *infra*, no reasonable jury could find that disability discrimination or plaintiff's request for a transfer played any role in defendants' decision to terminate him.

plaintiff was not disabled within the meaning of the ADA. [16] Accordingly, plaintiff cannot establish the second element of his discriminatory discharge claim as a matter of law, and summary judgment for defendants is warranted on this claim.

### b. Legitimate, Non-Discriminatory Reason for Discharge

Assuming *arguendo* that plaintiff has met his burden to make out a *prima facie* case of disability discrimination, the Court proceeds to consider whether defendants have proffered a legitimate, non-discriminatory reason for plaintiff's termination. The Court concludes that they have. Specifically, defendants have proffered evidence that plaintiff was terminated because he (1) regularly spent significant portions of his workday outside the Patchogue yard's region without authorization to do so; (2) claimed overtime compensation to which he was not entitled; and (3) failed to cooperate in good faith with National Grid's investigation into the

---

[16] The Court notes that, unlike a failure to accommodate claim, a discriminatory discharge claim may be based upon the "regarded as" theory of disability. *See, e.g., Graham v. Three Vill. Cent. Sch. Dist.*, No. 11-CV-5182 (JFB), 2013 WL 5445736, at \*26 n.12 (E.D.N.Y. Sept. 30, 2013). Under the ADA, as amended by the ADAAA, "'[a]n individual meets the requirement of 'being regarded as having such an impairment' if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental or impairment whether or not the impairment limits or is perceived to limit a major life activity.'" *Laurent v. G & G Bus Serv., Inc.*, No. 10-CV-4055 (JGK) (LMS), 2011 WL 2683201, at \*5–6 (S.D.N.Y. May 17, 2011) (quoting 42 U.S.C. § 12102(3)(A)), *report & recommendation adopted*, 2011 WL 2693651 (S.D.N.Y. July 11, 2011). However, in this case, plaintiff does not rely upon the "regarded as" theory of disability, (*see* Pl.'s Opp. 8–13), and therefore the Court does not consider it.

complaints that had been lodged against plaintiff.

It is undisputed that National Grid received two anonymous complaints concerning plaintiff. Upon an investigation into those complaints, National Grid's investigators discovered that plaintiff had made and received numerous calls during his normal work hours in locations east of the Patchogue yard's service area. (*See* McConnell Aff. Ex. D.) These calls indicate that plaintiff spent portions of his workday away from work, even on days when plaintiff claimed overtime compensation. (*See* McConnell Aff. Ex. E.) Indeed, plaintiff did not dispute that he would often return home during the workday. (McConnell Aff. ¶¶ 26–27; *see also* Anderson Dep. at 72.) Although plaintiff claimed that he had Howley's permission to return home (*id.* ¶ 27), plaintiff conceded that he had not informed Howley each time he left work to go home (*id.*), and Howley himself was under the impression that plaintiff's trips home were "sporadic" (Howley Dep. at 57–58). National Grid thus learned that plaintiff was spending portions of his workday—including days when he claimed to have worked overtime—at home.

Moreover, even when viewed in the light most favorable to the plaintiff, the undisputed evidence shows that plaintiff was not forthcoming with National Grid's investigators about his whereabouts during his workday. When first asked about how frequently he returned home during the normal workday, plaintiff told National Grid's investigators that he would go home two to three days per month. (Defs.' 56.1 ¶ 62.) Only when National Grid's investigators challenged plaintiff's assertion by showing him his phone records did plaintiff acknowledge that he would actually return home during the day several times per week. (*See* Anderson Dep. at 73; McConnell

Aff. ¶ 26.) Even then, Anderson claimed that he did not know precisely why he was spending so much time at home. (McConnell Aff. ¶ 27.) After the investigators pressed him further, however, he asserted that he was going home to rest his back. (*Id.*) Indeed, plaintiff even conceded in his deposition testimony that he had not been forthcoming from the start because, he claims, he wanted to protect his manager. (Anderson Dep. at 72.)

The foregoing, undisputed facts establish that plaintiff had violated National Grid's Standards of Conduct. In particular, the Standards of Conduct prohibited an employee from submitting false timesheets, (*see* Defs.' 56.1 ¶ 32; Standards of Conduct at 24; *see also* Anderson Dep. at 56 (agreeing that it was prohibited to seek compensation for time not worked)), and stated that the failure "to cooperate in good faith" with an internal investigation could lead to dismissal. (Standards of Conduct at 8). Shortly after National Grid's investigators interviewed plaintiff and submitted their findings to DeMarinis, plaintiff was fired. Accordingly, the Court concludes that defendants have set forth a legitimate, nondiscriminatory reason for their action. *See, e.g.*, *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 65 (2d Cir. 1997) (plaintiff's violation of company policy was a legitimate, nondiscriminatory reason for terminating plaintiff's employment); *Brown v. The Pension Boards*, 488 F. Supp. 2d 395, 406 (S.D.N.Y. 2007) ("'Certainly, an employer is entitled to discharge an employee who fails to follow company rules and fails to appear for work without notification, even if the absences are attributable to a medical problem.'" (quoting *Jackson v. Nor Loch Manor Healthcare Facility*, 297 F. Supp. 2d 633, 636 (W.D.N.Y. 2004), *aff'd*, 134 F. App'x 477 (2d Cir. 2005))); *Douglas v. Hip Centralized Lab. Servs., Inc.*, No. 03-CV-205 (SLT) (LB), 2005 WL 1074959, at *5 (E.D.N.Y. Apr. 29, 2005) ("Defendant's belief that Plaintiff violated company policy . . . constitutes a legitimate, non-discriminatory reason for terminating Plaintiff's employment.").

### c. Pretext

Because defendants have proffered a legitimate, non-discriminatory reason for plaintiff's termination, the Court turns to the ultimate question of whether plaintiff has presented evidence from which a reasonable jury could find that disability discrimination was a motivating factor in defendants' decision to fire plaintiff.

### i. Similarly Situated Employees

In support of his position that defendants' proffered reason for firing him was pretext for discrimination, plaintiff argues that National Grid did not terminate other, non-disabled field supervisors who had engaged in similar conduct. *Cf. Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 108 (2d Cir. 2010) (in age discrimination case, "the fact that other younger employees were not disciplined for violating numerous policies is both prima facie evidence of discrimination . . . and evidence that the reasons given by [defendant] for firing [plaintiff] were pretextual").

First, plaintiff claims that other field supervisors went home during the day on a regular basis—even on days they claimed overtime. He points to evidence that other field supervisors claimed to have worked overtime on days when, according to their phone records, they spent portions of those days outside their assigned regions. (*See* Tirelli Aff. Exs. Y–BB; *see also* Howley Dep. at 23–32, 35, 38–44, 46, 51–53.) Additionally, plaintiff cites the deposition

testimony of Stano, who stated that he was aware of field supervisors going home during the day. (Stano Dep. at 15–17.) In fact, Stano testified that "pretty much . . . every supervisor . . . tried to get closest to his house in the yard that they supervise and if they were watching crews at night on overtime, they would stop by." (*Id.* at 17.) According to Stano, supervisors would count the time they went home as hours worked for the day. (*Id.* at 17–18.) Finally, plaintiff cites generally to the overtime records of the different yards on Long Island, observing that the total number of overtime hours taken at the Riverhead and Patchogue yards amounted to less than the total number of overtime hours taken at other yards on Long Island. (*See* Pl.'s Opp. at 18.)

However, none of this evidence could persuade a reasonable jury that disability discrimination (or, for that matter, plaintiff's request for a transfer) motivated defendants to fire plaintiff. There is simply no evidence that National Grid knew about other field supervisors spending time at home during the workday and claiming overtime for time spent at home. Moreover, although plaintiff contends that Howley condoned this conduct by approving the field supervisors' time entries, there is no evidence that Howley knew about their conduct. Finally, the total number of overtime hours taken at the Riverhead and Patchogue yards as compared to other yards provides no indication of misconduct. Accordingly, no discriminatory inference can be drawn from the fact that National Grid neither investigated nor terminated other field supervisors. *See, e.g.*, *Shumway*, 118 F.3d at 64–65 ("It is impossible to demonstrate that UPS treated similarly situated males differently when there is no evidence that UPS knew about any other violations of the 'no fraternization' rule."); *Dinkins v. Suffolk Transp. Serv., Inc.*, No. 07-CV-3567 (JFB),

2010 WL 2816624, at *10 (E.D.N.Y. July 15, 2010) ("An employee who allegedly engaged in misconduct comparable to the plaintiff's is not similarly situated to the plaintiff when the employer is unaware of what the comparator employee supposedly did."); *accord Elam v. Regions Fin. Corp.*, 601 F.3d 873, 881 (8th Cir. 2010) (affirming district court's grant of summary judgment to defendant where, *inter alia*, "[plaintiff] did not present any evidence that . . . supervisors were aware of the alleged misconduct of [coworkers]").

Second, plaintiff compares his treatment to that of Stano, who was also the subject of an anonymous complaint but who does not suffer from a disability. (*See* Stano Dep. at 22.) National Grid investigated Stano for improperly carrying over vacation days that he had earned. (Stano Dep. at 20–21, 28–29.) Stano admitted that he had done so (*id.* at 21, 29), but he claims that his supervisors had approved it (*id.*). Unlike plaintiff, Stano was not terminated following National Grid's investigation. Instead, Stano retired in August 30, 2011, after he was offered a "buyout package" of one and one-half years' salary and a pension. (*Id.* at 9–10, 12.)

Plaintiff's comparison to Stano is inapt. Whereas plaintiff was admittedly not completely forthcoming with National Grid's investigators, the only evidence concerning Stano's investigation suggests that Stano was entirely forthcoming. (*See* Stano Dep. at 29 ("Q: And when you met with -- I guess you indicated Mr. Howley told you that you were meeting with some employees from HR regarding the anonymous complaint? A: Yes. Q: You met with those employees? A: Yes. Q: And you told them the truth? A: Of course, yes. Q: And you were forthcoming? A: Yes. Q: You didn't try to hide anything, did you? A: No, not at all.").) The fact that Stano cooperated fully with the investigation, whereas

plaintiff did not, is reason enough to hold that plaintiff and Stano were not similarly situated in all material respects. *See Schweit v. City of New York*, No. 04-CV-5462 (FB)(LB), 2007 WL 1133440, at *6 (E.D.N.Y. Apr. 17, 2007) ("[Plaintiff] has not shown that any of '[the proposed comparators] made false or misleading statements in connection with the investigation; consequently, [plaintiff] has not demonstrated that he and any other officers . . . were similarly situated in all material respects."). Additionally, the undisputed evidence in the record demonstrates that, even though Stano violated National Grid's vacation policy, he had received approval to do so from his superiors. (*See id.* at 21, 29, 34–35.) By contrast, although Howley told plaintiff generally to take care of his back, plaintiff conceded to investigators that he had not informed Howley each time he went home during the day (McConnell Aff. ¶ 27), and Howley believed plaintiff went home only sporadically (Howley Dep. at 57–58). Thus, "the context and circumstances" of Stano's policy violation were "sufficiently different" from plaintiff's alleged violations "to preclude a finding that they were similarly situated." *Conway v. Microsoft Corp.*, 414 F. Supp. 2d 450, 464 (S.D.N.Y. 2006) (citing cases); *see, e.g.*, *Pierce v. Netzel*, No. 98-CV-532A(F), 2004 WL 1055959, at *13 (W.D.N.Y. May 10, 2004) ("For an employee to be 'similarly situated' for the purpose of establishing disparate treatment in an employment discrimination case, the individual as to whom the plaintiff attempts to draw a comparison must be similarly situated in all material respects, such as . . . engaging in conduct similar to the plaintiff without any differentiating or mitigating circumstances that would distinguish their conduct or the appropriate discipline for it.").

In sum, a rational jury could not find that defendants' treatment of other employees suggests that disability discrimination was a motivating factor in their decision to terminate him.[17]

### ii. Whether Plaintiff Actually Violated National Grid's Standards of Conduct

Plaintiff also argues that the reasons given for his discharge were pretext for discrimination because he did not actually violate the Standards of Conduct. In particular, he claims that it would have been impossible for defendants to discern whether he worked overtime simply by looking at his phone records because field supervisors could earn overtime for work performed outside their assigned territory. (Pl.'s Opp. 18–19.) For instance, when presented with the overtime and phone records of other field supervisors, Howley could not say whether those supervisors had been entitled to overtime compensation. (Howley Dep. at 44.) Plaintiff also disputes National Grid's determination that he was uncooperative

---

[17] In an affidavit submitted in reply to plaintiff's opposition, DeMarinis avers that he did not know of any other individuals who had violated the Standards of Conduct when he fired plaintiff, but that he fired three different field supervisors—individuals without disabilities—in 2012 and 2013 for similar violations of the Standards of Conduct. (DeMarinis Reply Aff. ¶¶ 8, 11–13.) Because this affidavit was submitted for the first time on reply, in an abundance of caution, the Court will not consider it. *See, e.g.*, *Day Vill. Ltd. P'ship v. CW Capital L.L.C.*, No. 06-CV-3424 (LTS) (HBP), 2006 WL 2572118, at *3 (S.D.N.Y. Sept. 7, 2006) (refusing to consider affidavit submitted with reply papers); *cf. Bayway Ref. Co. v. Oxygenated Mktg. & Trading A.G.*, 215 F.3d 219, 227 (2d Cir. 2000) (holding that district court did not abuse discretion in considering affidavits submitted with reply papers where opposing party (1) was not surprised by the affidavits in question, (2) did not move for leave to file a sur-reply, and (3) made no claim that it had contrary evidence).

with National Grid's investigators. (*See* Pl.'s Opp. 20–21.)

As an initial matter, the undisputed facts show that defendants could have relied upon more than plaintiff's phone records in determining to terminate him. Critically, plaintiff admitted to investigators what the phone records suggested: that he was spending substantial time at his home during the workday without prior approval. Moreover, although plaintiff disputes the nature of his cooperation with investigators, he does not deny that he misinformed investigators about how much time he spent at home, and did not reveal that he was going home to rest his back. In addition, to the extent plaintiff claims that he appeared to be hiding information because he was nervous or surprised, plaintiff's reason for his response does not undermine the fact that he was not forthcoming to investigators.

More importantly, plaintiff's arguments go only to the accuracy or the wisdom of defendants' decision to terminate him; they do not create a triable issue of fact as to whether the proffered reasons for plaintiff's termination were a pretext for discrimination. The question in any discrimination case is not whether the defendant's decision to fire the plaintiff was correct, but whether it was discriminatory. *See, e.g.*, *McPherson v. N.Y.C. Dep't of Educ.*, 457 F.3d 211, 216 (2d Cir. 2006) ("In a discrimination case . . . we are decidedly not interested in the truth of the allegations against plaintiff. We are interested in what '*motivated* the employer. . . .'" (emphasis in original) (quoting *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 716 (1983))); *Kolesnikow v. Hudson Valley Hosp. Ctr.*, 622 F. Supp. 2d 98, 111 (S.D.N.Y. 2009) ("Where a plaintiff has been terminated for misconduct, the question is not 'whether the employer reached a correct conclusion in attributing

fault [to the plaintiff] . . . , but whether the employer made a good-faith business determination.'" (alterations in original) (quoting *Baur v. Rosenberg, Minc, Falkoff & Wolff*, No. 07-CV-8835 (GEL), 2008 WL 5110976, at *5 (S.D.N.Y. Dec. 2, 2008))); *Agugliaro v. Brooks Bros., Inc.*, 927 F. Supp. 741, 747 (S.D.N.Y. 1996) ("Even assuming defendants were wrong in their belief that plaintiff had engaged in sexual misconduct, what is significant is that they based their decision to dismiss plaintiff on that belief, and not on his age, gender, or pension status."). Even construing all inferences in plaintiff's favor, the evidence merely suggests that defendants conducted an imperfect investigation and were mistaken in their belief about plaintiff's conduct, not that they knew the complaints against plaintiff had no merit but chose to terminate plaintiff anyway for improper reasons. *DeFina v. Meenan Oil Co., Inc.*, 924 F. Supp. 2d 423, 435 (E.D.N.Y. 2013); *see Brown v. Soc'y for Seaman's Children*, 194 F. Supp. 2d 182, 191 (E.D.N.Y. 2002) ("[A]lthough plaintiff felt she had been treated unfairly, . . . [t]here simply is no basis in the record from which a rational juror could find that the reasons given for plaintiff's termination . . . were false or a pretext for discrimination.").

\*　　\*　　\*

In sum, considering the evidence as a whole and viewing that evidence in the light most favorable to plaintiff, no reasonable jury could find that discrimination played any role in defendants' decision to terminate plaintiff's employment. Plaintiff has put forth no evidence, other than his back condition, from which discrimination could be inferred. That single fact is countered by the undisputed, overwhelming evidence weighing against plaintiff's claim—namely, that plaintiff engaged, or at the very least defendants' believed he engaged, in multiple

acts of misconduct. Given the absence of evidence in support of plaintiff's claim, and the overwhelming evidence weighing against an inference of discriminatory intent, no reasonable jury could find that disability discrimination was a motivating factor in plaintiff's termination. Indeed, the only reasonable conclusion is that plaintiff was fired because he frequently went home during the workday without approval, including on days he claimed to have worked overtime, and appeared uncooperative with an investigation into his alleged misconduct. Even if defendants were mistaken, and plaintiff did not commit this misconduct, this only raises a question of fact as to whether plaintiff was fired unfairly, not whether he was the subject of discrimination. *See Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1187 (11th Cir. 1984) (stating that an "employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason"); *cf. Norton v. Sam's Club*, 145 F.3d 114, 120 (2d Cir. 1998) ("[T]he ADEA does not make employers liable for doing stupid or even wicked things; it makes them liable for *discriminating*, for firing people on account of their age." (emphasis in original)). For this reason, and because plaintiff has not shown that he was disabled within the meaning of the ADA, the Court grants summary judgment to defendants on plaintiff's discriminatory discharge claim.

### 3. Retaliation[18]

Plaintiff also claims that defendants terminated him in retaliation for his requests to be transferred from the Patchogue yard to the Riverhead yard. Retaliation claims brought under the ADA are examined within the *McDonnell Douglas* burden-shifting framework. *See, e.g.*, *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002). To establish a *prima facie* case of retaliation, the plaintiff must show the following elements: "(1) he engaged in an activity protected by the ADA; (2) the employer was aware of this activity; (3) the employer took adverse employment action against him; and (4) a causal connection exists between the alleged adverse action and the protected activity." *Id.*

The Court assumes *arguendo* that plaintiff has met his minimal burden to show a *prima facie* case of retaliation. At the next stage of the analysis, for the reasons discussed *supra*, the Court concludes that defendants have proffered a legitimate, non-discriminatory reason for terminating plaintiff.

Finally, the Court concludes that plaintiff has failed to come forward with evidence upon which a rational jury could conclude that his request for a transfer was causally connected to his termination. The Court relies on its discussion of the evidence in connection with plaintiff's discriminatory

---

[18] Although this Court has determined that plaintiff has failed to raise a genuine issue of material fact as to whether he was disabled under the ADA, the Court must still consider his claim for retaliation. "[C]ourts generally have recognized that nondisabled individuals who request reasonable accommodation are protected against retaliation, provided the request was made in good faith." *Keating v. Gaffney*, 182 F. Supp. 2d 278, 288 (E.D.N.Y. 2001) (citing *Weissman v. Dawn Joy Fashions, Inc.*, 214 F.3d 224, 233 (2d Cir. 2000)).

discharge claim and does not repeat that discussion here. *See, e.g.*, *Holt v. KMI-Continental, Inc.*, 95 F.3d 123, 130–31 (2d Cir. 1996) (affirming grant of summary judgment on claim for retaliatory discharge where "[d]efendant came forward with several legitimate reasons for the decision to fire plaintiff," and plaintiff "put forth no evidence to show that defendant's asserted reasons . . . were pretextual"). Moreover, the Court rejects plaintiff's additional argument that the temporal proximity between his requests for a transfer and National Grid's decision to fire him raises an inference of causation between the two. (*See* Pl.'s Opp. 24); *cf. Gorzynski*, 596 F.3d at 110 ("A plaintiff can indirectly establish a causal connection to support a discrimination or retaliation claim by showing that the protected activity was closely followed in time by the adverse employment action." (internal quotation marks and citation omitted)). In the instant case, plaintiff asked Howley to transfer him back to the Riverhead yard in January and February 2011 (Anderson Aff. ¶¶ 31–37), National Grid launched an investigation into plaintiff's conduct sometime after it received the anonymous complaint in March 2011 (Defs'. 56.1 ¶¶ 44–45), and National Grid terminated plaintiff on June 6, 2011 (*id.* ¶ 75). Even if National Grid began investigating plaintiff shortly after he requested a transfer to Riverhead, however, plaintiff completely ignores that the anonymous complaint filed against plaintiff constitutes an intervening event that defeats any inference of causation. *See, e.g., Nolley v. Swiss Reinsurance Am. Corp.*, 857 F. Supp. 2d 441, 461 (S.D.N.Y. 2012) ("An intervening event between the protected activity and the adverse employment action may defeat the inference of causation where temporal proximity might otherwise suffice to raise the inference."), *aff'd sub nom. Nolley v. Swiss Re Am. Holding Corp.*, 523

F. App'x 53 (2d Cir. 2013). Accordingly, plaintiff has failed to come forward with sufficient evidence for a reasonable jury to conclude that plaintiff's request for a transfer was a motivating factor in defendants' decision to terminate him.[19]

## B. NYSHRL Claims

Having determined that the federal claims against defendants do not survive summary judgment, the Court concludes that retaining jurisdiction over any state law claims is unwarranted. *See* 28 U.S.C. § 1367(c)(3); *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966). "In the interest of comity, the Second Circuit instructs that 'absent exceptional circumstances,' where federal claims can be disposed of pursuant to Rule 12(b)(6) or summary judgment grounds, courts should 'abstain from exercising pendent jurisdiction.'" *Birch v. Pioneer Credit Recovery, Inc.*, No. 06-CV-6497T, 2007 WL 1703914, at *5 (W.D.N.Y. June 8, 2007) (quoting *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 53 (2d Cir. 1986)).

In the instant case, the Court, in its discretion, "'decline[s] to exercise supplemental jurisdiction'" over plaintiff's state law claims because "it 'has dismissed all claims over which it has original jurisdiction.'" *Kolari v. N.Y. Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) (quoting 28 U.S.C. § 1367(c)(3)); *see also*

---

[19] Defendant also argues that DeMarinis did not know about plaintiffs' request for a transfer, and therefore he could not have relied on plaintiff's request in deciding to terminate him. (Defs.' Mem. at 24.) However, there is some dispute in the record concerning what DeMarinis knew before he decided to fire plaintiff. The Court, thus, declines to rely on this evidence in granting summary judgment for defendants. Even assuming DeMarinis had such knowledge, the claim cannot survive summary judgment for the reasons discussed above.

*Cave v. E. Meadow Union Free Sch. Dist.*, 514 F.3d 240, 250 (2d Cir. 2008) ("We have already found that the district court lacks subject matter jurisdiction over appellants' federal claims. It would thus be clearly inappropriate for the district court to retain jurisdiction over the state law claims when there is no basis for supplemental jurisdiction."); *Karmel v. Liz Claiborne, Inc.*, No. 99-CV-3608, 2002 WL 1561126, at *4 (S.D.N.Y. July 15, 2002) ("Where a court is reluctant to exercise supplemental jurisdiction because of one of the reasons put forth by § 1367(c), or when the interests of judicial economy, convenience, comity and fairness to litigants are not violated by refusing to entertain matters of state law, it should decline supplemental jurisdiction and allow the plaintiff to decide whether or not to pursue the matter in state court.").

Accordingly, pursuant to 28 U.S.C. § 1367(c)(3), the Court declines to retain jurisdiction over the remaining state law claims given the absence of any federal claims that survive summary judgment.

IV. CONCLUSION

For the reasons set forth herein, the Court grants defendants' motion for summary judgment in its entirety with respect to the federal claims. The Court declines to exercise supplemental jurisdiction over the state law claims and thus dismisses those claims without prejudice. The Clerk of the Court shall enter judgment accordingly and close this case.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: March 25, 2015
Central Islip, NY

*      *      *

Plaintiff is represented by Kathleen Ann Tirelli, Scott Michael Mishkin, P.C., One Suffolk Square, Suite 240, Islandia, NY 11749. Defendants are represented by Jessica C. Moller, Bond, Schoeneck & King PLLC, 1010 Franklin Avenue, Suite 200, Garden City, NY 11530, and Robert Arthur LaBerge, Bond, Schoeneck & King PLLC, One Lincoln Center, 16th Floor, Syracuse, NY 13202.